# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| ROBERT WHITE | CIVIL ACTION NO. 17-1022 |
|---|---|
| VERSUS | JUDGE TERRY A. DOUGHTY |
| RICKY SLAUGHTER, ET AL. | MAG. JUDGE KAREN L. HAYES |

## RULING

Plaintiff Robert White ("White") brought suit against his former employer, Crop Production Services, Inc. ("CPS") for alleged violations of the Louisiana Whistleblower Statute ("LWS"), LA. REV. STAT. § 23:967, *et seq.*,[1] and the Louisiana Environmental Whistleblower Statute ("LEWS"), LA. REV. STAT. § 30:2027. Pending before the Court is a Motion for Summary Judgment. [Doc. No. 38] filed by CPS.

For the following reasons, CPS's Motion for Summary Judgment is GRANTED, and White's claims against it are DISMISSED WITH PREJUDICE.

## I.   FACTS AND PROCEDURAL HISTORY

White was employed by CPS for approximately three years at its Waterproof, Louisiana location. At the time of his termination, he was the Operations Manager.

---

[1] White originally brought suit against his former supervisor, Ricky Slaughter, and CPS division manager, Tony Anderson. However, on December 19, 2017, the Court adopted the Report and Recommendation of the Magistrate Judge and dismissed the claims against these Defendants without prejudice.

CPS sells treated seed, fertilizer, and chemicals to farmers. Typically, a farmer will contact CPS to order seed treated with fertilizers and other chemicals. CPS then treats the seed with the chemicals and delivers the treated seed to the farmer.

As Operations Manager, White took orders for seed, chemicals, or fertilizer from customers, prepared the orders for processing, and ensured that the orders were properly loaded on the trucks for delivery to the farmer. He was also responsible for tracking the inventory of seed, fertilizer, and chemicals stored at the facility.

When processing an order of treated seed, White would first complete a form known as a "treat sheet" and then input the order into the computer system. The treat sheet is provided to the employees who will be actually applying the chemicals to the seed. The treat sheet shows the amount of seed to be treated, the chemicals to be applied to the seed, and the amount of chemicals to be applied to the seed. In order to complete the treat sheet, White had to determine the type of chemicals to apply and calculate the correct amount of chemicals to be used based on the order.

As part his duties as Operations Manager, White was designated by CPS as the location's safety coordinator, which also required him to coordinate monthly safety meetings for the employees at which he showed a video and gave a standardized test. The meetings and the content of the meetings were organized by a third-party vendor and required by company policy.

During his employment, White reported directly to Facility Manager, Ricky Slaughter ("Slaughter"). Slaughter was the highest-ranking employee at the Waterproof facility. White alleges that Slaughter engaged in actions that were against company policy and/or illegal.

According to White, Slaughter did not attend safety meetings, but instructed him to falsify records to show that Slaughter was present. White did not report this concern to anyone at CPS prior to his termination.

Additionally, White testified in his deposition that some time in 2016 he and Slaughter had a conversation about treating seeds with off-label chemicals. According to White, Slaughter said that this process was "illegal," and White responded that "We probably shouldn't do it." [Doc. No. 38-4, White Depo., p. 71]. While White is "sure" that he and Slaughter had other conversations about treating seed in this manner, he could not recall any other specific occasions. *Id.* at p. 72. After this conversation, White continued to complete treat sheets ordering treatment of seeds with chemicals that he believes were being used off-label after this 2016 conversation. In particular, White completed treat sheets on which he calculated chemical applications for orders using chemical products Acephate, Quadris, and Wrangler. He believes these chemicals were used for an off-label purpose in those orders. White did not report any concerns about off-label use of chemicals prior to his termination.

On or about April 13, 2017, White and Slaughter had an altercation regarding a change in a customer's seed order. Slaughter asked White to make a change to an order in the computer and White responded that the computer would not allow him to do it. According to White, Slaughter wanted him to delete some seed that had already been designated as treated and replace it with the treated seeds sold by a competing distributor, Tensas Farm Services, to one of its customers. The computer would not allow him to delete the entry because it had been entered one month prior to this time. The seed that Slaughter wanted to be entered had already been treated by Tensas Farm Services, and the customer did not need it. Either Tensas Farm Service or the customer would

3

have been "stuck" with the treated seed. Slaughter intended to sell it. While White thought this action was against company policy, he never though it was illegal. White speculated that Slaughter was selling the seed because that would financially benefit a seed representative who takes Slaughter on several expensive hunting trips each year.

During the altercation, Slaughter suggested several times that White go home. White became angry and shouted "F__k You" to Slaughter. White knew that conduct such as saying "F__k You" to his supervisor violated CPS policy and that it could result in his termination. White contends that this type of language is not uncommon among co-workers at the Waterproof facility. However, White offers no evidence that such language is commonly used by an employee to his supervisor at CPS, or that any other employee spoke this way to Slaughter or another supervisor and remained employed at CPS.

Slaughter contacted his supervisor, Marketing Manager Mark Matthews ("Matthews"),to discuss the altercation and decide what to do about it. Matthews agreed that termination was an appropriate response.

On April 20, 2017, Slaughter discussed the altercation with his Division Manager, Tony Anderson ("Anderson"). Anderson agreed that termination was the appropriate response, but also wanted Slaughter to speak with Region Human Resources Manager, Marilyn Major ("Major"), to make sure she agreed. Slaughter spoke with Major, who also agreed that termination was the appropriate response.

After discussing the event with Matthews, Anderson, and Major, Slaughter made the decision to terminate White. Slaughter terminated White on April 21, 2017.

On May 3, 2017, White called Anderson to request a meeting to discuss his termination. Anderson agreed to meet with White, along with Matthews, the following day at his office. At the meeting with Anderson and Matthews, White admitted to saying "F__k You" to Slaughter and admitted he knew he could be fired for doing it. White told Anderson and Matthews that he was sorry and wanted his job back. Anderson told White that he agreed with the decision to terminate him and would not overturn the termination.

After Anderson told him that he would not overturn the termination decision, White told Anderson and Matthews that they needed to know about certain activities at the Waterproof location. He specifically mentioned that he was concerned about missing inventory, that he did not believe Slaughter took safety meetings seriously, and that he had concerns about seed being treated with chemicals off-label. With regard to the missing inventory, White told Anderson and Matthews that there was a pallet of product that had been missing since early fall, and that when he asked Slaughter about it, he would respond by saying he knew where it was. White never reported this concern to Anderson or Matthews prior to their May 3, 2017 meeting. Although he was concerned about the missing inventory, White did not know whether any laws were violated.

With regard to the safety meetings, White told Anderson and Matthews that Slaughter did not participate in the safety meetings and would ask White to fill out his test for him.

With regard to seed treatment, White told Anderson and Matthews that Slaughter was treating seed with products not labeled for that use. Although White had complained to Slaughter previously about the seed treatment, he had not reported any of these concerns to Anderson or Matthews prior to this May 3, 2017 post-termination meeting.

White also had not reported any of these concerns to Major prior to his termination.

5

CPS has an anonymous hotline through which White could have reported any of his concerns, but never did so.

White initially brought suit in state court. In his Petition, White alleged that he was terminated after he "repeatedly questioned business practices which were illegal and outside the ordinary course of business for CPS." [Doc. No. 1-2, p. 3, Petition, ¶ 6]. He alleged four improper practices:

(1) Slaughter failed to attend mandatory safety meetings, and, when White questioned him, Slaughter ordered White to falsely report that he had attended;

(2) White raised concerns to Slaughter several times concerning the "improper seed treatment practices";

(3) White raised concerns to Slaughter about missing inventory and discrepancies in the inventory; and

(4) Slaughter directed White "to accept and input seed purchased from a different distributor into CPS's inventory so that the seed could be treated and re-sold as a CPS product." When White told Slaughter he could not do so because the seed was purchased from a different distributor, Slaughter demanded that he do so and threatened to fire him and find someone who would input the seed.

[Doc. No. 1-2, pp. 3, Petition, ¶¶ 6-12].

On August 11, 2017, the action was removed to this Court.

On January 14, 2019, CPS filed the instant Motion for Summary Judgment. [Doc. No. 38]. On February 5, 2019, White filed a memorandum in opposition to CPS's Motion for Summary

Judgment. [Doc. No. 44]. On February 12, 2019, CPS filed a Reply Memorandum in Support of its Motion for Summary Judgment. [Doc. No. 45].

## II.  LAW AND ANALYSIS

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with

conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

**B.     The LWS**

The LWS provides in pertinent part:

> A.     An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
>
> (1)    Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
>
> (2)    Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
>
> (3)    Objects to or refuses to participate in an employment act or practice that is in violation of law.

LA. REV. STAT. § 23:967(A).

The LWS defines reprisal to include "firing, layoff, loss of benefits, or any other discriminatory action the court finds was taken as a result of an action by the employee that is protected by Subsection A of this Section..." *Id.* § 23:967(C)(1).

"While the Louisiana Supreme Court has not spoken directly on whether [Title VII's] framework applies to section 23:967 cases, Louisiana courts have often looked to federal anti-discrimination jurisprudence in interpreting Louisiana's anti-discrimination statutes." *Smith v. AT&T Sols.*, 90 Fed.App'x. 718, 723 (5th Cir. 2004); *see also Sprull v. City of Baton Rouge*, 09-689, 2012 WL 2426793 at *2 (M.D. La. June 26, 2012). Indeed, the United States Court of Appeals for the Fifth Circuit recently noted that it has been "provided no Louisiana cases interpreting § 23:967 otherwise." *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 415 (5th Cir.

8

2018). Accordingly, the *McDonnell Douglas* burden-shifting framework is used to evaluate the evidence. *See Kirmer v. Goodyear Tire & Rubber Co.*, 538 Fed. App'x 520, 527 (5th Cir. 2013). Under that framework, White must first establish a *prima facie* case.

"In order for a plaintiff to establish a *prima facie* case of retaliation under [the LWS], he must show (1) that he engaged in activity protected by the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the activity in which he engaged and the adverse action." *Bain v. Ga. Gulf Corp.*, 462 Fed.App'x 431, 433 (5th Cir. 2012) (citations omitted); *see also Rayborn*, 881 F.3d at 415 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (other citations omitted)). More specifically, a plaintiff is charged with producing evidence to support his showing that the employer violated Louisiana law "through a prohibited workplace act or practice," that he "advised" the employer of the violation, that he "refused to participate in the unlawful practice or threat[ened] to disclose the practice; and that he was terminated "as a result." *Hale v. Touro Infirmary*, 2004-0003 (La. App. 4 Cir. 11/3/04); 886 So.2d 1210, 1216; *see also Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 187 (5th Cir. 2018) ("A violation of Louisiana's whistleblower statute occurs if: (1) LSU [as the employer] violated Louisiana law through a prohibited workplace practice; (2) Herster advised LSU of the violation; (3) Herster threatened to disclose or disclosed the prohibited practice; and (4) Herster was terminated as a result of her threat to disclose or because of the disclosure of the prohibited practice.").

To meet his showing, the employee must produce evidence that his employer actually violated state--not federal--law. *See Encalarde v. New Orleans Ctr. for Creative Arts/Riverfront*, 2014-2430 (La. 2/13/15). The Fifth Circuit, interpreting the LWS, has found that the plaintiff must

9

point to the *specific* provision of state law which the employer violated. *See Ware v. CLECO Power LLC*, 90 Fed. App'x. 705 (5th Cir. 2004); *Genella v. Renaissance Media*, 115 Fed.App'x. 650 (5th Cir. 2004). The employee's good faith belief of a state law violation is not enough; according to all Louisiana appellate courts that have considered the issue, the employer must have *actually* violated state law. *See, e.g., Accardo* 943 So.2d at 383; *Hale*, 886 So.2d at 1210, *writ denied*, 896 So.2d 1036 (La. 3/24/05); *Goldsby v. State Dep't of Corr.*, 861 So.2d 236 (La. App. 1 Cir/ 11/7/03), *writ denied*, 0328 870 So.2d 271 (La. 4/8/04), and *writ denied*, 870 So.2d 271 (La. 4/8/04); *see also Mabry v. Andrus*, 45, 135 (La. App. 2 Cir. 4/14/10); 34 So.3d 1075, 1081 (good faith belief insufficient); *Ganheart v. Xavier Univ.*, No. 07-9703, 2009 WL 24227 at *9 (E.D. La. Jan. 2, 2009) (same).

If White establishes a *prima facie* case of retaliation under the LWS, the burden shifts to CPS to produce a legitimate, nonretaliatory reason for its actions. If CPS produces such a reason, the burden shifts back to White to establish that CPS's legitimate reasons for the adverse employment action are pretext for a retaliatory motive.

    **1.**    **White's *Prima Facie* Case**

The Court organizes the analysis of White's *prima facie* case according to the law CPS allegedly violated. It is undisputed that White suffered an adverse action in this matter when he was terminated. However, the Court must look to the other elements of his *prima facie* case.

    *a.*    *Safety Meetings*

White points the Court to CPS's alleged violations of law because Slaughter failed to attend safety meetings and asked White to "falsify" that he did attend such meetings. However, White cannot meet his statutory burden on the basis of this claim. First, as White admits, these meetings

10

are required by CPS policy, not by state law. Therefore, he cannot show that there was an actual violation of state law.

Second, White does not allege that he objected to or refused to participate in the conduct prior to his termination.

Under these facts, CPS's Motion for Summary Judgment on White's claim regarding the safety meetings is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### b. *Missing Inventory*

White also claims that CPS had a pallet of product that had been missing since early fall, and that, when he asked Slaughter about it, Slaughter would respond that he knew where it was. White cannot meet his *prima facie* burden as to this claim either.

First, as with the allegation about the safety meetings, White cannot point to any specific state law that this missing pallet violated.

Second, White never reported this missing pallet to anyone before his termination.

Finally, there is no evidence of a causal connection between the allegedly missing pallet and his termination. Therefore, CPS's Motion for Summary Judgment on this claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### c. *Improper Seed Treatment*

White also claims that CPS was improperly treating seed by applying chemicals for off-label uses. In his opposition memorandum, White contends that off-label use of chemicals for seed treatment violates Louisiana Pesticide Law, LA. REV. STAT. 3:3252. Assuming that off-label use violates this specific state law, White has failed to produce evidence that he advised CPS of the violation of state law and then either threatened to disclose the practice or objected to

11

or refused to participate in the practice. In fact, according to his own account, it was Slaughter who said it was illegal, but, other than White's comment that they probably should not do it, he does not even claim that he refused to participate or objected to the practice. Accordingly, CPS's Motion for Summary Judgment on this claim is GRANTED as well, and this claim is also DISMISSED WITH PREJUDICE.

### 2. Legitimate Reasons for the Termination

Assuming White could establish a *prima facie* case under the LWS statute, the burden shifts to CPS to produce a legitimate reason for the termination. *See Stallworth v. Singing River Health Sys.*, 469 Fed. App'x 369, 371-72 (5th Cir. 2012) (citing *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010); *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 399, 401-02 (5th Cir. 2000)). This is a minimal burden that CPS easily meets.

Specifically, CPS points to White's yelling "F__k You" to Slaughter, his supervisor, during an altercation. Prior to terminating White, it is undisputed that Slaughter discussed the incident with Anderson, Matthews, and Major, all of whom agreed that termination was appropriate for this conduct. CPS has met its burden of producing a legitimate, non-retaliatory reason for termination.

### 3. Pretext

The burden of proof shifts to White to establish that CPS's reason for his termination are pretextual. White fails in this regard.

White has not cited evidence sufficient to find a genuine issue of material fact on pretext. Assuming *arguendo* that White could meet his *prima facie* burden, there is absolutely no evidence that Anderson, Matthews, or Major knew of the alleged activities at the time they approved and agreed with Slaughter that White should be terminated. Moreover, even if employees use profanity

at the Waterproof facility, White produced no evidence that a similarly situated employee directed a profane statement at his supervisor and then remained employed. Finally, while White speculates that Slaughter may have taken certain actions to increase his commissions and those of Anderson, he cannot rely on speculation to meet his burden. Under these circumstances, White cannot show that the legitimate, non-retaliatory reason for his termination was pretext for retaliation. Accordingly, CPS's Motion for Summary Judgment is GRANTED, and White's LWS claims based on the allegations regarding the safety meetings, the missing inventory, and the improper seed treatment are DISMISSED WITH PREJUDICE.

## C.     LEWA

White has also asserted claims under the LEWA. "The purpose of the [LEWA] is to protect employees from retaliatory action or other adverse employment action by employers for reporting possible environmental violations." *Collins v. State ex rel. Dep't of Nat. Res.*, 2012-1031 (La. App. 1 Cir. 5/30/13), 118 So. 3d 43, 49 (citing *Chiro v. Harmony Corp.*,99–0453 (La. App. 1 Cir. 11/5/99), 745 So.2d 1198, 1200, writ denied,99–3346 (La.1/28/00), 753 So.2d 840). The statute states, in pertinent part:

> A. No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall act in a retaliatory manner against an employee, acting in good faith, who does any of the following: (1) Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.

LA. REV. STAT. 30:2027.

As with the LWS, a plaintiff alleging retaliation under the LEWS "must show: (1) that he engaged in activity protected by the statute; (2) he suffered an adverse employment action; and (3)

a causal connection existed between the protected activity in which he engaged and the adverse action. *Cox v. Moses*, Civil Action No. 09–237–DLD, 2010 WL 2952716 at * (M.D. La. July 23, 2010) (citing *Stone v. Entergy Services, Inc.*, 9 So.3d 193 (La. App. 4th Cir.2009) (citing *Guillot v. Walgreen Louisiana, Inc.*, 2008 WL 1744717, *3 (W. D. La. April 16, 2008)); *Imbornone v. Treasure Chest Casino*, Civil Action No. 04-2150, 2006 WL 1235979, *3 (E.D. La. May 3, 2006)). Again, as with the LWS, Louisiana courts look to federal Title VII jurisprudence to interpret this law. *Stevenson v. Williamson*, 547 F.Supp.2d 544 (M.D. La.2008).

Unlike the LWS, the employee does not have to advise his employer of a specific violation of state law. "The scope of [this] statute encompasses the disclosure of violations of federal, state, and local laws." *Brown v. Catalyst Recovery of La., Inc.,* 2001-1370 (La. App. 3d Cir. 4/3/02); 813 So.2d 1156, 1167 (citing *Cheramie v. J. Wayne Plaisance, Inc.*, 595 So.2d 619 (La. 1992)). "[P]ursuant to the LEWA, an employee is protected if he discloses an employment practice 'that the employee **reasonably believes** is in violation of an environmental law, rule or regulation.'" *Roberts v. Florida Gas Transmission Co., L.L.C.*, 447 F3d. App'x 599, 602 (5th Cir. 2011) (emphasis added) (citing LA. REV. STAT. § 30:2027(A)(1)). An employee's failure to "identify any law, rule, or regulation which had been violated" is "not dispositive," but "any complaint regarding an employment practice which might have some hypothetical consequence on the environment does not amount to a reasonable belief that the practice is against the law." *Id.*

As with the analysis under the LWS, White has shown that he suffered an adverse employment action because he was terminated. Thus, the Court must consider whether he has produced a genuine issue of material fact for trial on the other elements of this cause of action.

14

### 1. Protected Activity

In addition to an adverse action, White must raise a genuine issue of material fact for trial that he engaged in an activity protected by the LEWA. In this case, there are two allegations that possibly support a cause of action under the LEWA: the improper seed treatment and his refusal to input seed from a competitor.

#### a. *Improper Seed Treatment*

White also claims that CPS was improperly treating seed by applying chemicals for off-label uses. In his opposition memorandum, White contends that off-label use of chemicals for seed treatment violates Louisiana Pesticide Law, LA. REV. STAT. 3:3252, which prohibits "making a pesticide . . . application inconsistent with the label." La. Rev. Stat. 3:3252(2). Additionally, White points to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, *et seq.*, which prohibits the "use" of "any registered pesticide in a manner inconsistent with its labeling." 7 U.S.C. § 136j(2)(G). Federal regulations promulgated under the FIFRA also prohibit this conduct. 40 C.F.R. § 170.9.

White argues that he was engaged in protected activity because Slaughter required him to treat seeds with chemicals inconsistent with their labeling. He specifically directs the Court to the label for Wrangler, which states that it is for "foliar applications" and does not mention seed treatment. [Doc. No. 44, Exh. A]. Slaughter himself allegedly said that off-label use was "illegal," and White said that they probably should not do it.

Additionally, White has presented a declaration from James Barnes, a former CPS employee, who supports White's allegations that Slaughter directed employees to illegally treat seeds.[2]

Based on the plain language of the statute, the Court finds that White has raised a genuine issue of material fact for trial. Contrary to CPS's argument, the statute does not require that White make a "complaint" about the activity. Rather, viewing the evidence in the light most favorable to White and applying the plain language of the LEWA, White has raised a genuine issue of material fact for trial that he, in "good faith," "disclose[d]" to his "supervisor," Slaughter, that they should not engage in the treatment of seeds with chemicals not labeled for that use if, as Slaughter himself acknowledged, such treatment was "illegal."

### b. *April 13, 2017 Incident*

White also contends that he was engaged in protected activity on April 13, 2017, during the incident which ultimately led to his termination. In his deposition, White recounted the details of the incident as follows:

> Q: Mr. White, it's my understanding that you and -- you and Ricky Slaughter had an altercation in or around April of 2017. Is that right?
>
> A: That's right.
>
> Q: Okay. Can you tell me what you recall about that?
>
> A: A truck -- a delivery truck from a competitor drove up in our lot. Ricky [Slaughter] unloaded a mini-bulk of seed off of their delivery truck and brought it to the warehouse, and he set it down and told me to go in the

---

[2] To the extent that Robert Barnes made other allegations about what he did or did not do while employed at CPS, reports he made, and his speculation about the reasons why, the Court has largely disregarded his testimony. While some of the testimony may provide background and bolster White's claims, the Court's focus in this case must be on White's alleged protected activities and the other elements of this LWS and LEWA claims, not on reports or claims or activities by other employees.

> computer and take off—delete some seed that we already designated as being treated, and we were gonna replace them [with] what he had in the bag, what he had brought over from the competitor. Well, let's see. I told him I couldn't do that. I thought it had been in a prior month, and it [the computer] won't allow me to go back a prior month and delete it.
>
> Q: The computer won't allow you to go back?
>
> A: No. It won't allow me. And I told him I couldn't do that, and he – he acted like he got angry, and he said, "Well, I'll find somebody that can." And I said, "What's all this about anyway, Ricky? What – what are those seed?" He said, "They're a customer of Tensas Farm Services that had some seed treated, and they don't – they don't need them." And so – never–not a customer of ours. Never has been a customer and probably never will be a customer of CPS. And I told him – I said, "You know, this is bullshit." And he got mad – he got mad, and he said, "Why don't you just go home?" He just kept saying that over and over again. And I said, "What is this all about?" Do you just—" He said, "Well, I'm doing it for Davy. Davy Mize." And I said, "What does Davy got to do with this?" He said, "Well, Davy wanted me to take them and sell them," and I said, "I know what this is." I said, "You know, all these hunting trips and fishing trips Davy takes you on. That's exactly what you're doing. You're just staying in good graces with Davy," who is rep of Monsanto, and that's who these companies like us, like CPS, buys their seed with. And he really got angry then, and he started - - you know, he just kept telling me to go home and go home and go home. And I told him – I said, "I don't want to go home." And he just kept on and on with it, and I finally said two ugly words to him, and that was it.
>
> Q: Just so we're clear, you said, "[F k] you"?
>
> A: I did.

[Doc. No. 38-4, White Depo., pp. 88-90]. White now contends that the off-label treatment of seeds "led to [his] disagreement with Slaughter," [Doc. No. 44-3, White Declaration], but this contention is not supported by his deposition testimony. While a party may supplement his deposition testimony with a later affidavit or declaration, he is not permitted to do as White attempts to do here and contradict his deposition testimony. *See S.W.S. Erectors, Inc. v. Infax,*

17

*Inc.*, 72 F.3d 489, 496 (5th Cir. 1996) ("When an affidavit merely supplements **rather than contradicts** prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment.") (emphasis added) (citing *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988). Therefore, the Court must rely on White's deposition testimony in evaluating this claim.

Applying the plain language of the LEWA, the Court finds that White has not raised a genuine issue of material fact that he, acting in good faith, disclosed or threatened to disclose to a supervisor " an activity, policy, practice of [CPS] . . . that [White] reasonably believ[ed] [was] in violation of an environmental law, rule, or regulation." LA. REV. STAT. 30:2027. Instead, White's altercation with Slaughter, as he described it, was based on an objection that they should not be inputting seed from a competitor for someone who was not CPS's customer in order to curry favor with a Monsanto seed sales representative. While such action might well be against company policy or bad business, nothing about the described encounter suggests that an environmental law, rule, or regulation has been violated. Therefore, this incident does not raise a genuine issue of material fact for trial that White was engaged in protected activity under the LEWA on April 13, 2017.

### 2. Causal Connection

The Court has found, however, that White did raise a genuine issue of material fact for trial that he was engaged in protected activity in the 2016 conversation. Therefore, the Court must consider whether White can raise a genuine issue of material fact for trial that this activity was causally connected to his termination.

The Court finds that White fails in this regard. It was Slaughter, not White, who initially raised the issue of off-label seed treatment. While White stated that they probably should not do it, he made this statement some time in 2016, at least one year before his termination. After that time, he never objected to the practice, refused to continue to engage in these activities, reported to those above Slaughter and through a complaint line, or took any other actions to indicate his belief that CPS was engaged in illegal conduct. The Court has found that his attempt to tie his April 13, 2017 altercation with Slaughter to off-label seed treatment contradicts his deposition testimony. Therefore, White can rely only on the one 2016 statement, which is too far removed from the termination decision to provide evidence of a causal connection.

Additionally, as the Court found in its analysis of White's LWS claims, White does not deny that he yelled "F__k You" to Slaughter, his supervisor, during an altercation. He has no evidence to dispute that Slaughter discussed the incident with Anderson, Matthews, and Major, all of whom agreed that termination was appropriate for this conduct. He does not deny that there is absolutely no evidence that Anderson, Matthews, or Major knew of any alleged improper activities at the time they approved and agreed with Slaughter that White should be terminated. Finally, as the Court has previously stated, White's (or anyone else's) speculation for the reasons for Slaughter's actions or inactions is not evidence. Under these circumstances, White has failed to raise a genuine issue of material fact for trial that there is a causal connection between any protected activity under the LEWA and his termination.

Accordingly, CPS's Motion for Summary Judgment is GRANTED, and White's LEWA claims are also DISMISSED WITH PREJUDICE.

**III.    CONCLUSION**

For the foregoing reasons, CPS's Motion for Summary Judgment [Doc. No. 38] is GRANTED, and White's claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 26th day of February, 2019.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE